TERRI F. LOVE, Judge.
| ¶ This appeal arises from the termination of the parental rights of Jody and Darlene Domingo. Jody and Darlene Domingo appealed asserting that their child was not taken from them while under supervision by the Office of Community Services, as required by the statute. We find that Louisiana requires the consideration of several factors, which include whether the Office of Community Services was supervising the family and the best interest of the child. Accordingly, we find that the trial court did not err and affirm.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

L.D.,[1] born on February 22, 2002, was first taken into custody by the Department of Social Services/Office of Community Services (“DSS/OCS”) on July 31, 2002, at the age of five months. L.D. lived with her maternal aunt, Diane King (“Mrs. King”), until February 18, 2004. Jody and Darlene Domingo (“the Domingos”) lost custody of L.D. due to drug and alcohol addiction, which interfered with their ability to take care of L.D. DSS/OCS returned L.D. to the Domingos on February 18, 2004, with supervision continuing for the first six months.
On March 24, 2005, DSS/OCS received a call informing them that Mr. |2Domingo had allegedly tested positive for marijuana at work; that Mrs. Domingo’s older daughter, who smoked marijuana a great deal, was living with them; and that an accused rapist was babysitting L.D. On April 19, 2005, L.D. was taken into DSS/ OCS custody due to concerns regarding drug and alcohol addiction. L.D. was *781 placed in the care of Mrs. King, where she remains.
During L.D.’s second DSS/OCS custodial period, the Domingos visited with L.D. at a DSS/OCS office. On several occasions it is alleged that the Domingos brought a pit bull puppy, beer, and a friend, whom L.D. never met to OCS office for visitation. The Domingos were told to correct this behavior, as all instances violated DSS/ OCS protocol.
DSS/OCS’s case plan instituted after L.D. was placed into custody the second time consisted of reunification and adoption. The case plan did not provide for the Domingos to undergo drug screening, substance abuse treatment, or parenting classes paid for by DSS/OCS because DSS/ OCS provided every service available during the first custodial period. The Domin-gos participated in educational programs regarding the cessation of drug/alcohol use and parenting during the second custodial period. Additionally, the Domingos tested positive for drugs.
An instanter order was filed following L.D.’s removal on April 19, 2005, which was followed by a petition to have par-entis) declared in need of care and/or supervision and minor child in need of care and/or supervision with or without foster care. Almost a year and a half later, DSS/OCS filed for the termination of parental rights pursuant to La. Ch. C. art. 1015(3) and (5). The trial court granted the termination of parental rights finding clear and convincing proof that parental rights and obligations are “totally and irrevocably terminated and dissolved lapursuant to La. Ch. C. art. 1015(3)(j)” and in the best interest of the child, pursuant to La. Ch. C. art. 1037. This suspen-sive appeal followed.

STANDARD OF REVIEW

Appellate courts review a trial court’s determination to terminate parental rights using the manifest error/clearly wrong standard. State ex reí. S.M.W., C.D.W., C.N.W., and E.S.W., 00-CJ-3277 (La.2/21/01), 781 So.2d 1223, 1233. Therefore, if the trial court’s determination is a reasonable conclusion from weighing the credibility of conflicting testimony, we must affirm. Id.

TERMINATION OF PARENTAL RIGHTS

The Domingos contend that the trial court erred in terminating their parental rights to L.D. because DSS/OCS concluded their supervision prior to the March telephone call or April, when L.D. was taken into DSS/OCS custody again.

Law

The Louisiana Children’s Code article 1015 provides that the grounds for terminating parental rights under § 3 and § 5 are:
(3) Misconduct of the parent toward this child or any other child of the parent or any other child in his household which constitutes extreme abuse, cruel and inhuman treatment, or grossly negligent behavior below a reasonable standard of human decency, including but not limited to the conviction, commission, aiding or abetting, attempting, conspiring, or soliciting to commit any of the following:
(a) Murder.
(b) Unjustified intentional killing.
(c) Aggravated incest.
(d) Rape.
(e) Sodomy.
(f) Torture.
(g) Starvation.
(h) A felony that has resulted in serious bodily injury.
(i) Abuse or neglect which is chronic, life threatening, or results in gravely *782 disabling physical or psychological injury or disfigurement.
|4(j) Abuse or neglect after the child is returned to the parent’s care and custody while under department supervision, when the child had previously been removed for his safety from the parent pursuant to a disposition judgment in a child in need of care proceeding.
(k) The parent’s parental rights to one or more of the child’s siblings have been terminated due to neglect or abuse and prior attempts to rehabilitate the parent have been unsuccessful.
(l) Sexual abuse, which shall include, but is not limited to acts which are prohibited by R.S. 14: 43.1, 43.2, 80, 81, 81.1, 81.2, 89 and 89.1.
[[Image here]]
(5) Unless sooner • permitted by the court, at least one year has elapsed since a child was removed from the parent’s custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home. (Emphasis added).
The elements required by La. Ch. C. art. 1015 must be proven by clear and convincing evidence. La. Ch. C. art. 1035. While the elements of La. Ch. C. art. 1015 are required, the “evidence must allow the conclusion that termination is in the best interest of the child.” State, ex rel. E.N., M.N., and K.Q., 00-0239, pp. 5-6 (La.App. 4 Cir. 8/2/00), 774 So.2d 194, 197. This Court has held that the family need not necessarily be under supervision of DSS/ OCS if termination is in the best interest of the child and the evidence documents that the parents will unlikely change their behavior. Id. at p. 11, 774 So.2d at 200.

Testimony

Cynthia Lucas (“Ms. Lucas”), formerly an investigator with DSS/OCS and now a foster care manager, testified regarding the telephone calls received concerning the Domingos’ behavior. Ms. Lucas stated that someone telephoned |fiDSS/OCS on March 24, 2005, informing the agency that Mr. Domingo allegedly tested positive for marijuana at work and was fired. The caller also stated that Mrs. Domingo’s older daughter was living in the household and smoking a great deal of marijuana. Further, the caller said that an alleged rapist was babysitting L.D. However, Ms. Lucas testified that DSS/OCS did not take L.D. into custody in March.
Lieutenant Robert Broadhead (“Lt. Broadhead”), the shift commander at the Arabi Station of the St. Bernard Sheriffs Department, observed the Domingos acting “extremely intoxicated” on April 19, 2005. Lt. Broadhead testified that the Domingos had taken Ativan, Lortab, and Soma. He stated that when the officers were about the leave the Domingos’ residence, they found another child never mentioned by the Domingos. The Domin-gos forgot that a friend’s child was in the residence. Lt. Broadhead testified that the Domingos did not become more coherent as the night progressed. Further, he stated that the officers had difficulty getting information from the Domingos about a relative that could pick up L.D. because of their intoxicated state. Lastly, Lt. Broadhead testified that he was “more than sure what” he “saw that day was levels of intoxication.”
*783 Marsha Roome (“Ms.Roome”), a former case manager for DSS/OCS, testified as to the details of the Domingos’ first supervisory period with DSS/OCS. Ms. Roome stated that the Domingos were under official supervision until August 2004. She testified that as of April 27, 2005, the case plan goal was adoption. However, she stated that the Domingos were allowed two visits a month with L.D.
Dr. Amy Dickson (“Dr. Dickson”), an expert in clinical psychology, testified that the Domingos did not acknowledge substance abuse problems. She stated that at least one drug test was diluted. Dr. Dickson testified that L.D. was “drastically | ^different with her aunt” and that L.D. wanted to remain with Mrs. King. Further, Dr. Dickson testified that it was not in L.D.’s best interest to be reunited with her biological parents.
Monique Stiegler (“Ms. Stiegler”), an expert in licensed clinical social work, met with L.D. three times. Ms. Stiegler testified that L.D. had “anger issues and bad self concept” as a result of living with the Domingos. She stated that L.D. should remain with Mrs. King and any disruption of that would be “detrimental” to L.D.
Tina Loze (“Ms. Loze”), the Domingos’ former neighbor, testified regarding the Domingos’ actions that made them appear intoxicated. She stated that she observed the Domingos using drugs. Ms. Loze observed L.D. outside alone, left in the car alone, home alone, and walking in a diaper on a daily basis.
Debra Warner (“Ms. Warner”), one of L.D.’s other aunts, testified that Mrs. Domingo had substance abuse problems since she was a teenager. Ms. Warner stated that since L.D.’s return to Mrs. King, L.D. is affectionate and social again.
Raul Machuca (“Mr. Machuca”), a counselor educator with Family Services of Greater New Orleans, who is nationally certified with a specialty in community counseling, testified that he began seeing the Domingos in 2005 for parenting classes. He stated that the Domingos attended several sessions, but they were scheduled to complete the program after Hurricane Katrina. After Hurricane Katrina, the Domingos re-enrolled in parenting classes with a referral from DSS/OCS. Mr. Machuca testified that a substance abuse program began in May 2006, in which the Domingos participated. However, he stated that the Domingos never acknowledged that they had a “substance abuse problem.” The Domingos finished twenty four sessions. Mr. Machuca testified that Mr. Domingo was asked |7to submit to a drug test every week because of a positive drug test. Mrs. Domingo tested positive for drugs prior to L.D.’s Christmas pageant. Further, he stated that the Domingos tested positive for drugs after the completion of the program and while they were in relapse prevention. Lastly, Mr. Machuca testified that some tests were allegedly false positives.
Serina Walker (“Ms. Walker”), a foster care worker with DSS/OCS assigned to L.D. after Ms. Roome, testified that the case plan developed into a concurrent plan of adoption and reunification. Ms. Walker stated that the Domingos’ requirement to pay child support was communicated orally and in writing. Ms. Walker never received child support from the Domingos. Lastly, Ms. Walker told the Domingos that they were not prohibited from attending family functions.
Sylvia Gray (“Ms. Gray”), the ease manager for L.D., supervised the Domingos’ visits with L.D. The Domingos had two visits a month with L.D. that lasted one hour each. Ms. Gray testified that Mrs. King did not stay for the visits. Ms. Gray stated that the Domingos brought a visi *784 tor, whom L.D. did not know, a pit bull puppy, and wanted to bring a cat to their visitations. However, they were told that this was not allowed. Ms. Gray testified that Mrs. Domingo said she would never attend an alcoholics or narcotics anonymous meeting. Further, Ms. Gray stated that Mrs. Domingo told L.D. to tell everyone that she wanted to live with her parents. Mrs. Domingo also told L.D. that the fact that she told L.D. what to say was a secret. Ms. Gray instructed Mrs. Domingo to tell L.D. that kids do not keep secrets, but she did not. Ms. Gray stated that adoption is better for L.D. Paula Bennett (“Ms. Bennet”), Ms. Gray’s supervisor, told the Domingos not to bring friends to the visitations and that alcohol was not allowed as the Domingos’ friend was allegedly drinking alcohol.
|sMrs. King testified that her sister, Mrs. Domingo, had a substance abuse problem when they were kids. She paid for inpatient rehabilitation, but Mrs. Domingo did not complete the program. Mrs. King stated that Mrs. Domingo began outpatient treatment when L.D. was taken away the first time. She testified that L.D. called her “mommy,” but that it was not her goal to adopt L.D. Mrs. King stated that she overheard the Domingos discussing how to cheat drug tests. Lastly, Mrs. King testified that Mrs. Domingo’s first son died of an overdose, while Mrs. Domingo’s first daughter continues to have substance abuse problems.
Mr. Domingo testified that he has a substance abuse problem. He stated that he began taking prescription medication after an accident. Mr. Domingo testified that he did not have a conversation with Mrs. Domingo about cheating drug tests. He stated that he remains in a substance abuse program and that he completed a program with St. Bernard Mental Health. Mr. Domingo testified that he did not pay child support for L.D., but he received the case plan stating that he should pay.
The Louisiana Children’s Code provides that parental rights may be terminated when a child has previously been determined “in need of care,” is presently abused or neglected, and the child is “under department supervision.” If a year, or less if permitted by the court, has passed since the child was taken into custody and the parents have not substantially complied with the case plan, parental rights may be terminated if there is “no reasonable expectation of significant improvement.” In addition to the above provisions, courts must also consider the best interest of the child. While the Domingos contest that they were not under DSS/ OCS supervision when L.D. was taken the second time, State, ex rel. E.N., M.N., and K.Q. held that supervision was unnecessary if termination was in the best interest of the child and the parents were unlikely to change.
l3 The record reflects that the Domingos continued to test positive for drugs after the first time L.D. was in DSS/OCS custody and they received every treatment provided by DSS/OCS. The Domingos also tested positive for drugs after L.D. was taken into custody the second time and failed to pay child support. The testimony does not document an appreciable decrease in the Domingos’ substance abuse. This evidence does not demonstrate a likelihood that the Domingos will change their behavior. Additionally, the experts and DSS/OCS testimony demonstrated their belief that L.D.’s best interest is served by terminating the Domingos’ parental rights and allowing Mrs. King to pursue adoption.
Considering the testimony regarding substance abuse, the conflicting testimony regarding treatment and classes, the experts’ opinions about L.D.’s welfare and *785 condition, and this Court’s holding in State, ex rel. E.N., M.N., and K.Q., we do not find that the trial court was manifestly erroneous in terminating the Domingos’ parental rights.

DECREE

For the above mentioned reasons, we find that the trial court did not err by terminating the parental rights of the Do-mingos.
AFFIRMED.

. This Court utilizes the initials "L.D.” to protect the identity of the juvenile.